OPINION
Defendant-appellant, Janet L. Kortum, appeals her conviction in the Mason Municipal Court for vehicular homicide. The trial court's decision is affirmed in part, reversed in part, and remanded for further proceedings.
Mason-Montgomery Road in Deerfield Township, Warren County, Ohio, is a four-lane road that runs north and south, with two lanes in each direction. At its intersection with Irwin-Simpson Road, Mason-Montgomery Road widens for a center, left turn lane. This intersection is controlled by stoplights in all four directions. As of August 5, 1999, the stoplights did not include green arrows for left turns off of Mason-Montgomery Road.
At about 2:30 p.m. on August 5, 1999, appellant was driving her minivan northbound on Mason-Montgomery Road with her daughter, Heather, riding in the front passenger-seat. The light for the northbound traffic was red. Appellant stopped in the center turn lane and activated her left turn signal. Danny Simpson stopped behind appellant, and Velma Raines stopped behind Simpson.
When the light turned green, appellant moved into the intersection waiting for traffic to pass, preparing to turn left onto Irwin-Simpson Road. Jeff Hummer was driving southbound on Mason-Montgomery Road in the curbside lane, preparing to make a right turn onto Irwin-Simpson Road. He was followed directly by Paula Innis. Both Hummer and Innis came to complete stops and did not enter the intersection.
Bobby Marshall, riding his motorcycle behind Innis, changed lanes, and proceeded southbound through the intersection in the innermost southbound lane of Mason-Montgomery Road. He was followed by Kelly Jackson, who was also traveling in the innermost southbound lane. At the same time, appellant began to turn onto Irwin-Simpson Road, across Mason-Montgomery Road's southbound lanes. Marshall drove into the front wheel of the minivan, and was thrown off of his motorcycle and over the minivan. He landed on the road next to Simpson and Raines' vehicles. Marshall was not wearing a helmet when the accident occurred.
Emergency personnel were called to the scene where they treated Marshall. He died from the head trauma suffered as a result of being thrown onto the roadway.
Appellant was subsequently charged with one count of vehicular homicide. Appellant pled not guilty and a jury trial was held. At the conclusion of the jury trial, appellant was convicted of vehicular homicide. Appellant appealed, arguing that the trial court had erred by failing to grant her motion for a mistrial after learning that discovery provided to the defense by the prosecution and relied upon the defense in its presentation of the case was inaccurate. This court reversed appellant's conviction and remanded the matter for a new trial. State v.Kortum (Oct. 2, 2000), Warren App. No. CA2000-02-016, unreported.
The evidence at appellant's second trial revealed the following:
 Raines testified that she traveling north on Mason-Montgomery Road and at the time of the accident was in the left-turn lane, two vehicles behind appellant's minivan. Raines testified that she saw "several cars coming, a motorcycle, and maybe six or seven cars." Raines testified that she saw the minivan turn left and saw the driver of the motorcycle attempt to slow down. Raines stated, "I could see that [the motorcyclist] was trying to get out of the way when all of a sudden he hit the van, flew over the van." Raines testified that when she saw the minivan turn, she thought to herself, "[O]h, my God, what are they thinking." Raines thought that the driver of the minivan should have waited for the traffic to go by before attempting to turn. Raines testified that the traffic light was green when the minivan began to turn.
Jackson testified that she was directly behind the motorcycle traveling south. She testified that the motorcyclist had changed lanes in front of her in a safe manner. Jackson estimated that this lane-change occurred eighty feet from the intersection. Jackson testified that the traffic light was green when the motorcycle entered the intersection but it "quickly turned yellow." Jackson testified that after the collision the traffic light turned red. Jackson testified, "[I]n my estimation, he had the right of way, and I think she just didn't see him." Jackson had time to stop safely after she saw the traffic light turn yellow.
Next, Simpson testified. He was directly behind appellant's minivan at the time of the accident. Simpson testified that the traffic light was green at the time the motorcycle entered the intersection. Simpson testified that appellant proceeded to turn left, even though the motorcycle was approaching the intersection at normal speed. At the time, Simpson asked himself why appellant was turning. He testified, "I don't think anybody in that situation would have I mean, attempt to make a left turn."
Trooper Paul Lezotte of the Ohio State Highway Patrol testified about his investigation of the accident, which included interviews with appellant and eyewitnesses. He arrived at the scene about ten minutes after the accident. Trooper Lezotte testified that appellant told him that she had been at the intersection waiting to make a left-hand turn onto Irwin-Simpson Road. Appellant told the trooper that when the traffic light turned yellow, the on-coming traffic appeared to be stopping for the red light. Appellant stated that she turned left, and the motorcycle hit the right front-end of her minivan. Appellant told Trooper Lezotte that she saw the motorcycle when it was four to five car-lengths away, but she thought that it was stopping. Trooper Lezotte testified that the speed limit at the intersection is fifty-five m.p.h. The trooper's investigation resulted in no evidence that appellant was speeding, under the influence of drugs or alcohol, using a cell phone, or eating at the time of the accident.
Timothy Tuttle testified as an expert in the area of crash reconstruction and analysis. Tuttle calculated Marshall's speed to be approximately forty-seven m.p.h. and appellant's speed to be ten m.p.h. at the time of impact. Tuttle admitted that it was possible that Marshall had been accelerating at the time of the collision. During cross-examination, Tuttle testified that based upon the information he had there was no way to determine whether there had been a red-light traffic violation.
At the close of the state's case, appellant made a motion for acquittal, which was denied. She then presented her defense, which included testimony from other eyewitnesses and experts.
Roger Davis testified that at the time of the accident he was traveling eastbound on Irwin-Simpson Road and was between six hundred and eight hundred feet away from the intersection. The traffic light facing him was red as he approached the intersection. Davis testified that he saw two vehicles traveling south on Mason-Montgomery Road, in the curb lane. These two vehicles were slowing down to a stop, and a motorcycle was behind them. Davis testified that he saw the motorcycle "jut out behind the last vehicle and accelerate." Davis, a motorcyclist himself, testified that the model of motorcycle Marshall was riding is a very fast accelerating cycle. Davis estimated that the motorcycle was traveling at a speed of twenty-five to thirty m.p.h. and then accelerated to a speed of forty-five m.p.h.
Davis testified that the motorcyclist did not appear to slow down or attempt to avoid the impact. Davis testified that at the time he thought, "There was an accident that was unavoidable." Davis saw the impact, looked up, and noticed that the traffic light facing him had turned to green. Davis testified, "I thought the [motorcyclist] ran the red light trying to beat the light." Davis testified that the motorcycle was seventy-five to one hundred feet from the intersection when the minivan began to turn left.
Hummer testified that at the time of the accident he was driving south on Mason-Montgomery Road. As he approached the intersection, the traffic light turned yellow, so he slowed down to stop before the light turned red. Hummer testified that it took him about four seconds to come to a complete stop and that he intended to turn right onto Irwin-Simpson Road as soon as the intersection cleared. Hummer testified that when he was watching for the traffic to clear, he saw the motorcycle collide with the minivan. On cross-examination, Hummer conceded that he did not know whether the traffic light was yellow or red when the motorcycle entered the intersection.
Paula Innis testified that she was also traveling southbound on Mason-Montgomery Road in the curb lane at the time in question. Innis testified that the traffic light turned yellow when she was one hundred fifty to two hundred feet away from the intersection. Innis testified that it took her five to six seconds to stop, and that there was one car that was stopped ahead of her. After she was completely stopped, she saw the motorcycle in her side-view mirror changing lanes from the curb lane to the middle lane. Innis testified that the motorcycle did not accelerate but maintained a constant speed. The motorcycle traveled past Innis and continued through the intersection without slowing down. Before the accident occurred, Innis said to herself, "I can't believe he's going to run the red." On cross-examination, however, Innis testified that she did not see the color of the traffic light at the time of impact.
Appellant also testified about what had occurred at the time of the accident. She was driving northbound on Mason-Montgomery Road and had come to a complete stop behind the stop bar, preparing to turn left onto Irwin-Simpson Road. Appellant testified that the traffic light turned to yellow, and she saw two cars that had stopped in the curb lane. Appellant also saw a motorcycle behind these two cars, changing lanes from the curb lane to the center lane. Appellant testified, "[T]he motorcycle appeared, even though he was changing lanes, to be slowing. The light changed. The cars had stopped. I thought it was safe to make the turn. * * * * The next thing I know, the air bags had deployed and my daughter is screaming in the car." On cross-examination appellant testified, "From where [the motorcycle] was, from what I could perceive, the gentleman was stopping for the light, and he would have been safely stopped before I crossed that stop bar. I would not have turned, especially with my daughter in the car, if I had not thought it was * * * safe to turn." Appellant further testified that she believed the traffic light was red when the motorcycle traveled through the intersection.
Appellant also presented the testimony of expert witnesses. Donald Kime, an instructor of motorcycle safety, testified that he teaches his students that other drivers may misperceive motorcyclists' speeds and intentions, especially when a motorcycle and another vehicle are traveling towards each other. Ronald Huston, an accident reconstructionist, testified that he had considered the accident report, witness statements, pictures of the intersection, the timing of the traffic light signal, and conversations he had with appellant. Huston testified that in his opinion, the traffic light had just turned red as the motorcycle entered the intersection.
After hearing rebuttal testimony from Tuttle, the evidence was concluded, and the trial court judge instructed the jury on the law involved in the case. The trial court judge did not instruct the jury on all of the instructions requested by the defense, and the defense objected to this decision. After deliberation, the jury returned a verdict of guilty. Appellant appeals, raising four assignments of error for our review:
Assignment of Error No. 1:
 THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT DENIED MRS. KORTUM'S RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL.
In her first assignment of error, appellant argues that her conviction for vehicular homicide was not supported by sufficient evidence and was against the manifest weight of the evidence. Appellant contends that it was error for the trial court to overrule her motion for acquittal.
The function of an appellate court when reviewing the sufficiency of the evidence underlying a criminal conviction is "to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id.
Appellant was convicted of vehicular homicide, a violation of former R.C. 2903.07(A), a first-degree misdemeanor. At the time of the accident R.C. 2903.07 stated, "No person, while operating or participating in the operation of a motor vehicle * * * shall negligently cause the death of another * * *."[1] Criminal negligence is defined in R.C. 2901.22(D) as:
 A person acts negligently when, because of a substantial lapse from due care, [she] fails to perceive or avoid a risk that [her] conduct may cause a certain result or may be of a certain nature. A person is negligent with respect to circumstances when, because of a substantial lapse from due care, [she] fails to perceive or avoid a risk that such circumstances may exist.
Reviewing the testimony presented, there is certainly sufficient evidence to demonstrate beyond a reasonable doubt that appellant's operation of her motor vehicle caused Marshall's death. The more difficult question is whether appellant's actions constituted criminal negligence. Appellant asserts that the state failed to prove beyond a reasonable doubt that she had acted with criminal negligence in that the state did not show that her actions constituted a substantial lapse from due care. Appellant argues that failing to perceive that the motorcycle was going to continue driving through the intersection did not amount to a substantial lack of due care.
As this court has previously stated, "[t]he determination of whether a lapse of due care is substantial is a question for the trier of fact."State v. Self (1996), 112 Ohio App.3d 688, 693. "Substantial" is another word for "material," which means "being of real importance or great consequence." Id.
R.C. 4511.42 states the following:
 The operator of a vehicle * * * intending to turn to the left within an intersection * * * shall yield the right of way to any vehicle * * * approaching from the opposite direction, whenever the approaching vehicle * * * is within the intersection or so close to the intersection * * * as to constitute an immediate hazard.
The state presented evidence to show that appellant had committed a traffic violation by failing to yield the right-of-way to Marshall and argued that appellant's actions constituted vehicular homicide.
A mere violation of a traffic law with nothing more does not necessarily demonstrate a substantial lapse of due care as required to convict a defendant of vehicular homicide. See State v. Jones (Aug. 10, 2001), Miami App. No. 2000-CA-57, unreported; State v. Boggs (Aug. 11, 1981), Belmont App. No. 80-B-46, unreported. However, in order to demonstrate criminal negligence in a vehicular homicide case, it is not necessary to show that something was distracting a defendant or otherwise occupying her attention at the time of the accident. See State v.McKeand (Sept. 29, 1986), Butler App. No. CA86-02-018, unreported. Evidence indicating that a defendant simply did not see an oncoming vehicle when she should have may sufficiently demonstrate a substantial lapse of due care for the purposes of R.C. 2903.07(A). Id. at 7-8; see, also, State v. Varney (June 22, 1987), Butler App. No. CA86-07-100, unreported.
Raines, who was in the left-turn lane on Mason-Montgomery Road, two vehicles behind appellant's minivan, testified that the traffic light was green when appellant began to turn left, and that she believed that the driver of the minivan should have waited for the traffic to go by before making the turn. Raines was surprised that appellant attempted to make the turn when she did. Jackson, another eyewitness, testified that the traffic light was green when the motorcycle entered the intersection. Jackson believed that the motorcyclist had the right-of-way and that appellant failed to see him. In addition, Simpson testified that the traffic light was green when the motorcycle entered the intersection and that he did not think anyone else in appellant's situation would have tried to make a left turn at that moment.
The state presented three different eyewitnesses, in addition to an accident reconstructionist, to demonstrate that appellant had committed a substantial lapse of due care by failing to perceive a risk. Therefore, we find that sufficient evidence was presented to prove beyond a reasonable doubt that appellant's failure to yield to oncoming traffic when attempting to make a left turn was a criminally negligent act and that by so doing, appellant committed vehicular homicide.
Appellant also argues that her conviction is not supported by the weight of the evidence. The standard of review based upon the manifest weight of the evidence has been summarized as follows:
 The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.
State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting State v.Martin (1983), 20 Ohio App.3d 172, 175. An appellate court will not reverse a judgment as against the manifest weight of the evidence in a jury trial unless it unanimously disagrees with the jury's resolution of any conflicting testimony. Thompkins at 389. When reviewing the evidence, an appellate court must be mindful that the original trier of fact was in the best position to judge the credibility of witnesses and the weight to be given the evidence. State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus.
Appellate courts are cautioned to sustain manifest weight arguments only in the most extraordinary cases. State v. Langenkamp (2000),137 Ohio App.3d 614, 617. At trial appellant presented witness who testified that the motorcyclist acted in an unsafe manner as he approached and traveled through the intersection. Some of the testimony presented even suggested that Marshall had entered the intersection when the traffic light was red. On the other hand, several witnesses testified that appellant had acted in an unsafe manner by not allowing the traffic to clear the intersection before attempting to turn. Some of these witnesses were shocked by appellant's decision to turn. Upon reviewing the testimony presented at trial, we conclude that the jury was free to find that the manifest weight of the evidence supported a conviction of vehicular homicide. The first assignment of error is overruled.
Assignment of Error No. 2:
 THE TRIAL COURT ERRED BY OVERRULING MRS. KORTUM'S REQUEST FOR SPECIAL JURY INSTRUCTIONS.
In her second assignment of error, appellant asserts that the trial court erred by refusing to give jury instructions she submitted that explained the term "substantial lapse of due care" and distinguished criminal negligence from civil negligence.
A trial court must give the jury all instructions that are relevant and necessary for the jury to weigh the evidence and fulfill its duty as the fact-finder. State v. Comen (1990), 50 Ohio St.3d 206, 210. A trial court may refuse to give an instruction that is not applicable to the evidence presented or is an incorrect statement of law. State v. Cross
(1979), 58 Ohio St.2d 482, 488. An appellate court reviewing a trial court's refusal to give a requested jury charge based upon the evidence at trial shall not reverse the decision of the trial court unless an abuse of discretion is shown. State v. Bishop (Oct. 5, 1998), Madison App. No. CA97-07-032, unreported, at 6, citing State v. Endicott (1994),99 Ohio App.3d 688, 693.
The jury was provided with the instructions for vehicular homicide as found in Ohio Jury Instructions. The jury was properly instructed on the definition of criminal negligence. The instructions proffered by the defense but not given to the jury by the trial court included instructions based upon law from jurisdictions outside of Ohio. The remaining instructions proffered by the defense but not approved by the trial court were based upon Ohio courts whose jurisdiction does not include the Mason Municipal Court. We conclude that the trial court did not abuse its discretion by refusing to give all of the jury instructions requested by the defense. The second assignment of error is overruled.
Assignment of Error No. 3:
 THE TRIAL COURT ERRED BY IMPOSING A HARSHER SENTENCE UPON MRS. KORTUM AFTER SHE PURSUED A SUCCESSFUL APPEAL.
In her third assignment of error, appellant contends that it was inappropriate for the trial court to sentence her more severely after she was found guilty at the conclusion of her second trial. The state responds that the trial court's action did not constitute an abuse of discretion.
"Due process of law * * * requires that vindictiveness against a defendant for having successfully attacked [her] first conviction must play no part in the sentence [she] receives after a new trial." NorthCarolina v. Pearce (1969), 395 U.S. 711, 725, 89 S.Ct. 2072, 2080. The decision of a judge to impose a more severe sentence upon a defendant after a second trial must be based upon reasons that appear on the record so that the constitutional legitimacy of the increased sentence may be thoroughly reviewed on appeal. Id. at 726, 89 S.Ct. 2072, 2081. The presumption of vindictiveness may be overcome only by objective information justifying the increased sentence. Wasman v. United States
(1984), 468 U.S. 559, 564, 104 S.Ct. 3217, 3221, citing United States v.Goodwin (1982), 457 U.S. 368, 374, 102 S.Ct. 2485, 2489.
The Pearce presumption of vindictiveness does not apply when a sentence imposed after trial is greater than that previously imposed after a guilty plea. Alabama v. Smith (1989), 490 U.S. 794, 795,109 S.Ct. 2201, 2206. Also, the Pearce presumption of vindictiveness does not apply where a defendant was sentenced by two different sentencers. Lodiv. McMasters (1986), 31 Ohio App.3d 275, 277, citing Texas v. McCullough
(1986), 475 U.S. 134, 106 S.Ct. 976. Neither of these exceptions is present in the case before us.
Where no explanation for an increased sentence following a second trial of a defendant appears in the record, the increased sentence is constitutionally defective and the matter must be remanded for resentencing. See State v. Jackson (1985), 21 Ohio App.3d 157, 158-59;State v. Clements (Sept. 27, 1995), Montgomery App. No. 15155, unreported. Therefore, appellant's sentence is reversed and remanded to the trial court for resentencing. If the trial court decides to impose a harsher sentence than that imposed at appellant's first trial, then the trial court shall affirmatively state upon the record the reasons for imposing a harsher sentence. The third assignment of error is sustained.
Assignment of Error No. 4:
 THE TRIAL COURT ERRED AS A MATTER OF LAW BY ORDERING MRS. KORTUM TO PAY THE COSTS OF HER FIRST TRIAL.
In her fourth assignment of error, appellant insists that the trial court erred by ordering appellant to pay the costs from her first trial because her original conviction was reversed upon appeal. The state argues that because appellant was ultimately convicted, charging her with the costs of both trials was appropriate.
R.C. 2947.23 states:
 In all criminal cases, including violations of ordinances, the judge or magistrate shall include in the sentence the costs of prosecution and render a judgment against the defendant for such costs. If a jury has been sworn at the trial of a case, the fees of the jurors shall be included in the costs, which shall be paid to the public treasury from which the jurors were paid.
 As a general rule, when the meaning of a statute is not clear, the courts will attempt to determine the intent of the legislature. State v. Watkins (1994), 96 Ohio App.3d 195, 198, citing Henry v. Cent. Natl. Bank (1968), 16 Ohio St.2d 16, paragraph one of the syllabus; R.C. 1.49. In R.C. 2901.04(A), the legislature has provided that provisions of the revised code defining offenses or penalties "shall be strictly construed against the state, and liberally construed in favor of the accused." Watkins at 198.
It has been held that "the costs of prosecution, including jury fees, can be assessed against a defendant only if the state is successful."State v. Powers (1996), 117 Ohio App.3d 124, 128. In Powers, the Sixth District Court of Appeals examined R.C. 2947.23 and determined that the word "sentence" meant "[t]he judgment formally pronounced by the court or judge upon the defendant after his conviction in a criminal prosecution."Id. That court concluded that the trial court could assess against the defendant only those costs associated with a bench trial of a misdemeanor charge and not those incurred as result of a jury trial on charges of assault and menacing, of which the defendant was acquitted. Id.
In State v. Sales (Aug. 6, 1985), Carroll App. No. 504, 1985 WL 7023, unreported, the Seventh District Court of Appeals affirmed a trial court's decision to include as court costs the expense of a jury trial that resulted in a mistrial because of a hung jury. However, the court, noted that
 [i]n arriving at this decision, we note that this proposition cannot be applied in every case that results in a mistrial. A determination of what causes a mistrial must be made. In many instances it may be the fault of the prosecution's misconduct; in another instance it may be that of the defense. We determine this issue in the instant case under the facts that the former jury could not agree and therefore resulted in a mistrial.
Id. at *2. Although this statement from the Seventh District Court of Appeals is dicta, we find its reasoning to be persuasive and choose to apply it to the circumstances of the case now before us.
Appellant's direct appeal of her original conviction resulted in the reversal of that conviction. See State v. Kortum (Oct. 2, 2000), Warren App. No. CA2000-02-016, unreported. This court found that the trial court erred by not declaring a mistrial after the state's "surprise revelation."[2] We found that it was the state's failure to provide reliable discovery that undermined the fairness of appellant's first trial and necessitated the reversal of appellant's original conviction.Id. at 7-8. Therefore, we hold that the costs of the first jury trial should not be assessed against appellant. The fourth assignment of error is well-taken.
Appellant's sentence is to be modified by the trial court so that it no longer includes as part of its sentence the costs of the first jury trial.
Judgment affirmed in part, reversed in part, and remanded to the trial court for further proceedings according to law and consistent with this opinion.
WALSH and POWELL, JJ., concur.
[1] Former R.C. 2903.07 was repealed by S.B. 107, effective March 23, 2000, and vehicular homicide is now prohibited by R.C. 2903.06(A)(3) and (B)(2).
[2] This revelation was that, contrary to the discovery provided by the state and the testimony of the state trooper who wrote the accident report, the speed limit where the accident occurred was not forty-five m.p.h. but fifty-five m.p.h. Kortum at 6. This fact undermined the defense's theory of the case that the deceased had been speeding at the time he entered the intersection. Id. at 7.